UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**UNITED STATES OF AMERICA**
ex rel. GREGORY CHABOT,

    **Plaintiffs,**
v.                                                                         **Case No.: 6:06-cv-01536-Orl-35KRS**

**D&G DISCOUNT HOMES, LLC,**

    **Defendant.**
_____/

**ORDER**

**THIS CAUSE** comes before the Court on consideration of Plaintiff Chabot's Motion for Entry of Default Judgment against Defendant D&G Discount Homes, LLC. (Dkt. 37). Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **GRANTS in part** and **DENIES in part** Plaintiff's Motion for Entry of Default Judgment.

**I.    Summary**

On October 2, 2006, Gregory Chabot, proceeding as *qui tam* plaintiff on behalf of the United States, filed a verified complaint against Defendant D&G Discount Homes, LLC ("D&G"), alleging violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* (2006). (Dkt. 1). Plaintiff served the complaint on D&G on November 30, 2007. (Dkt. 6). On February 14, 2008, D&G filed an answer *pro se*. (Dkt. 10). The Magistrate Judge struck D&G's *pro se* answer on March 20, 2008, because a corporation cannot appear and be heard in this Court except through counsel of record. (Dkt. 12). The

1

Magistrate Judge's order striking D&G's answer gave D&G until April 4, 2008, to retain counsel to file an answer on its behalf. (Dkt. 12).  D&G failed to retain counsel to file an answer on its behalf.  Pursuant to Chabot's motion (Dkt. 13), the Court directed the Clerk of Court to enter a default against D&G. (Dkt. 14).  The Clerk of Court entered default against D&G on April 18, 2008. (Dkt. 15).  On June 30, 2008, Chabot filed a motion seeking entry of a final default judgment. (Dkt. 21).  This Court adopted in part Judge Spaulding's report and recommendation denying Chabot's motion, but granted Chabot leave to amend the complaint to address the deficiencies identified by Judge Spaulding. (Dkt. 28).  Attempting to address the deficiencies identified by Judge Spaulding, Chabot filed an Amended Complaint on July 13, 2009, (Dkt. 29), and subsequently filed the instant Motion for Entry of Default Judgment on December 15, 2009. (Dkt. 37).

## II.  Allegations of Plaintiff's Amended Complaint

Accepting as true the uncontroverted allegations of the complaint, the Court concludes that the following facts are conclusively proven as to the defaulting Defendant.[1]

In 2004, many residences in various counties in the State of Florida suffered significant damages due to hurricanes Charley, Frances, Ivan, and Jeanne. (Dkt. 29 ¶ 7). The federal government declared the significantly affected counties as disaster areas.  (Dkt. 29 ¶ 7).  In order to provide relief to citizens who lost their homes in the

---

[1] These "facts" are not binding on any other party who has answered and contested the disputed allegations of the Plaintiff as asserted in other similar actions.

declared disaster areas, the Federal Emergency Management Agency ("FEMA") initiated a temporary housing program to provide shelter to those displaced victims through the installation of manufactured/mobile homes. (Dkt. 29 ¶ 8).

FEMA provided Request for Quotation packages ("RFQs") to contractors so the contractors could bid for the contracts to haul and install manufactured/mobile homes and travel trailers. (Dkt. 29 ¶ 9). FEMA's acceptance of a contractor's bid converted the RFQs into binding contracts. (Dkt. 29 ¶ 9). The RFQs required the bidder to comply with all Federal, State and Local requirements. Specifically, section 1.5 required the contractor to obtain all proper licenses and permits to set up units. (Dkt. 29 ¶ 10). FEMA and its contracting officer conditioned payment on the applicant's compliance with the RFQs' licensing requirements and FEMA would have terminated the contracts if it discovered that the FEMA contractors were unlicensed. (Dkt. 29 ¶ 11).

Regulations promulgated by the Bureau of Mobile Homes provide that "no person may perform manufactured/mobile home installation unless licensed by the department pursuant to section 320.8249, [Florida Statutes], regardless of whether that person holds a local installer's license or any other local state license." (Dkt. 29 ¶ 15). Section 320.8249(7)(a), (b) and (f), Florida Statutes, prohibits a person from falsely holding out a business organization as a licensed mobile home installer without being duly licensed.

In addition, the RFQs' provisions that governed the standards for installing travel trailers obligated D&G to supervise and provide construction services involving water and sewer connections, electrical, plumbing, site preparation, heating and air conditioning, and the onsite construction of handicap ramps. (Dkt. 29 ¶ 25). While these construction activities that involve the installation of travel trailers are not

regulated by section 320, Florida Statutes, and the Bureau of Mobile Homes, the scope of these construction activities related to the installation of travel trailers required D&G to obtain a Division I general contractor's license under section 489.105(3)(a), Florida Statutes, in order to subcontract with other Division II licensees such as electricians, plumbers, and other specialty contractors.  (Dkt. 29 ¶ 25).

D&G is a Florida corporation whose principle place of business is Jacksonville, Florida.  (Dkt. 29 ¶ 4).  D&G is not licensed to install manufactured/mobile homes in the State of Florida, nor is it registered as a business with a qualifying agent who has a Florida Division I general contracting license.  (Dkt. 29 ¶ 4).

On or about September 20, 2004, Gary Garrand, from D&G, contacted Chabot and asked if Chabot would sell him installation certification decals so that he could have an out-of-state unlicensed crew install temporary housing under a contract with FEMA. (Dkt. 29 ¶ 29).  Chabot informed Garrand that it was illegal to sell decals and if Garrand was an unlicensed contractor, he was ineligible for a FEMA contract.  (Dkt. 29 ¶ 29).

On October 5, 2005, Chabot received a RFQ package that contained an e-mail regarding an earlier pre-bid conference.  (Dkt. 29 ¶ 32).  Chabot discovered that there were unlicensed people or companies listed in the e-mail. (Dkt. 29 ¶ 32).  Chabot complained to the Bureau of Mobile Homes about the solicitation of unlicensed companies. (Dkt. 29 ¶¶ 35–36).  Over the course of many months, Chabot investigated the administration of the manufactured housing installation program, traveled to the various declared disaster areas, and discovered that unlicensed contractors were installing the manufactured homes.  (Dkt. 29 ¶¶ 38–39).

In the amended complaint, Chabot alleges that D&G was on notice that under the express terms of the RFQ: D&G could only tender for acceptance those items that conformed to the requirements of the contract; that the RFQ required the bidders, including D&G, to comply with all Federal, State and Local regulations; and, that the RFQ obligated D&G to obtain all proper licenses and permits to set up units.  (Dkt. 29 ¶ 44).  Chabot further alleges that even though D&G was aware that it was not properly licensed to install mobile homes, it was not a licensed Division I contractor, and it did not comply with the express terms of the RFQ, D&G knowingly submitted its bid and entered into a contract with FEMA.  (Dkt. 29 ¶ 47).  In addition, Chabot alleges that D&G, with actual knowledge, deliberate ignorance or reckless disregard for the truth of their falsity, made *implied false certifications* that it complied with the express licensing terms of the "RFQ-contract" when it submitted 18 individual claims for payment under the "RFQ-contract." (Dkt. 29 ¶ 48).

### III.  Legal Standard and Analysis

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default."  Fed. R. Civ. P. 55(a).  However, a defendant's default alone does not require the court to enter a default judgment.  DIRECTV, Inc. v. Trawick, 359 F. Supp. 2d 1204, 1206 (M.D. Ala. 2005).  To enter a judgment, there must be sufficient basis in the pleadings to support the relief sought.  Id.  "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short, . . . a default is not treated as an absolute confession

5

of the defendant of his liability and of the plaintiff's right to recover." Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975).

    A.  Liability

Under the FCA, a person is liable to the United States Government if that person "knowingly presents, or causes to presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; or knowingly makes, uses, or causes to be made or used, a false record of statement to get a false or fraudulent claim paid or approved by the Government . . . ." 31 U.S.C § 3729(a)(1) (2006).  The FCA defines claim as the following:

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c) (2006).

It is significant to note that Chabot is not alleging D&G defrauded the government through affirmative false statements.  Instead, Chabot is arguing that D&G violated the FCA by knowingly omitting or failing to disclose material information to the government. (Dkt. 37 at 2).  In short, Chabot is arguing that D&G was not in compliance with State law; compliance with State law is necessary in order to be eligible to bid or submit claims under the "RFQ-contract"; D&G submitted claims for payment knowing that it

was ineligible for the payment demanded on those claims; therefore, D&G knowingly submitted a false claim to the government.

This Court finds McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256 (11th Cir. 2005), controlling in the instant case.  In McNutt, a former employee of a medical services company filed a *qui tam* action against the owners of the medical services company. Id. at 1257.  The government intervened and alleged that Medicare providers are required to enter a provider agreement with the government where the Medicare provider certifies that it will comply with all laws and regulations concerning proper practices for Medicare providers.  Id. at 1258.  One of the laws included in the certification was the Anti-Kickback Statute.  Id. (citing 42 U.S.C §1320a–7b(b)). The government alleged that the Medicare provider (defendants) violated the Anti-Kickback Statute rendering them immediately ineligible to contract as a Medicare provider; therefore, the defendants "knowingly presented, or caused to be presented, false or fraudulent claims for payment in violation of the False Claims Act." Id.  The defendants in McNutt filed a motion to dismiss for failure to state a claim upon which relief could be granted.  Id.  The court in McNutt, found that the government alleged a valid claim because the government "alleged that the [defendants] violated the Anti-Kickback Statute; compliance with the Statute is necessary for reimbursement under the Medicare program; and the [defendants] submitted claims for reimbursement knowing that they were ineligible for the payments demanded in those claims." Id. at 1260.

This Court finds that, as to liability, Chabot has alleged a valid cause of action for which default judgment is appropriate.  Like McNutt, Chabot alleges that under the terms of the FEMA contract, "D&G was required to comply with all Federal, State and

7

Local regulations." (Dkt. 37 at 3). Florida law prohibited unlicensed persons from performing or supervising the installation of mobile homes, FLA. STAT. § 320.822(14), and prohibited an unlicensed person from falsely holding itself out as a licensed mobile home installer, acting in the capacity as a mobile home installer, and contracting with owners to install mobile homes. FLA. STAT. § 320.8249(7)(a), (b), (c), & (f). Chabot alleges that D&G was aware that it was not properly licensed to install mobile homes, yet D&G knowingly submitted its bid and entered into a contract with FEMA. (Dkt. 29 ¶ 47). Additionally, Chabot has alleged that D&G was required to be a Division I licensed contractor to oversee the installation of travel trailers and the various sub-specialties necessary for those installations; that it was not so licensed; and that it impliedly represented that it was so licensed in its submission of invoices for payment on bids for travel trailer installations. Finally, Chabot has alleged that these false claims were material to FEMA in the assessment of payment of invoices under the contract.

As such, it is **HEREBY ORDERED** that default judgment as to liability is **GRANTED**.

### B. Statutory Penalties

If a person is liable under the FCA, that person is subject to "a civil penalty of not less than $5000.00 and not more than $10,000.00 . . . ." 31 U.S.C § 3729 (1). Under the FCA, a penalty is attached to each identifiable demand for payment or claim made. Imposition of penalties under the FCA is mandatory for each false claim. U.S. v. Killough, 848 F.2d 1523, 1533 (11th Cir. 1988). Chabot alleges that D&G submitted 18 claims for payment to FEMA, all of which were false because D&G was an unlicensed

...

contractor and impliedly certified that D&G complied with the terms of the "RFQ-contract." (Dkt. 29 ¶ 48). Chabot requests the maximum civil penalty. (Dkt. 37 at 13).

"The range in the amount of forfeitures apparently represents congressional intent to allow discretion in assessing forfeitures." U.S. v. Hill, 676 F. Supp. 1158, 1182 (N.D. Fla. 1987). Furthermore, case law suggests that the plaintiff must present evidence as to why the Court should award an amount over the statutory minimum. See U.S. v. Boutte, 907 F. Supp. 239, 242 (E.D. Tex. 1995) (awarding statutory minimum because the plaintiff did not present evidence as to why the fine should be higher than the minimum) (citing U.S. v. Fliegler, 756 F. Supp. 688. 694 (E.D.N.Y. 1990) (finding that because the government failed to present any reason why the highest fine is appropriate, the court awarded the minimum statutory fine)). In support of the demand for the maximum penalty, Chabot asserts in conclusory fashion that it would be appropriate because the Defendant defaulted and acted knowingly in the commission of the violations. Knowledge is an element of the offense and should not serve as the sole basis for enhancing the penalty. Additionally, Chabot cites no authority for the notion that defaulting defendants should be assessed maximum penalties as additional penalties for defaulting. Accordingly, the Court determines in its discretion that the minimum award is sufficient under these facts to address the violations asserted and established by default in this action.

C. Damages

Chabot alleges that the proper measure of damages is the full amount the government paid to D&G pursuant to the 18 invoices for installation of mobile homes

9

and travel trailers. (Dkt. 37 at 13–14). Chabot argues that the full amount billed in the 18 invoices is the actual damage the government suffered as a direct result of D&G's implied false certification because the government received no tangible benefit from D&G. In support of this argument, Chabot relies on <u>Peterson v. Wienberger</u>, 508 F.2d 45, 48–52 (5th Cir. 1975). This case, however, is distinguishable from <u>Peterson</u>. In <u>Peterson</u>, the defendants billed the government for services that the defendants did not personally perform or supervise. <u>Id.</u> at 48–49. In contrast, D&G provided services to the government and conferred a tangible benefit upon the United States, which ultimately assisted the victims of the disaster. Indeed, if D&G's services were defective as alleged, it is precisely because they performed under the contract without a license. Thus, unlike <u>Peterson</u> where the defendants were licensed but did not perform, D&G performed but was not licensed.

Chabot argues that the government did not get the benefit of the bargain, and asserts that the benefit, under the contract, was having a licensed contractor supervise, warrant, and perform the installation of mobile homes. (Dkt. 37 at 15). Chabot's argument is unpersuasive. As much as the government bargained for services, the "RFQ-contracts" also required that D&G bear the cost of providing the workers, the material, and installing the mobile homes and travel trailers. Consequently, the government received a tangible benefit that is quantifiable. Chabot cites <u>United States ex rel. Longhi v. Lithium Power Techs.</u>, 530 F. Supp. 2d 888 (S.D. Tex. 2008), to support the rejection of the "no harm, no foul" argument. Chabot ignores the fact that <u>Lithium Power Techs.</u>, also holds that where the government receives a tangible benefit, damages should be offset by the tangible benefit that the government received.

530 F. Supp. 2d at 895.  "Under a standard benefit of the bargain model, the government should not be able to keep [the tangible benefit] and get the damages for the entire amount paid."  Id. (citing RESTATEMENT (SECOND) OF TORTS § 549).

Chabot argues in the alternative, that if this Court "somehow determines that the government received the value of the $981,491.50 in services billed by D&G, D&G would at a minimum still be liable for $1,962,983."[2]  As the Court has not determined the value of the benefit that the government received, the Court will not entertain this argument.

Furthermore, this Court finds United States v. Miller, 645 F.2d 473, (5th Cir. 1981), which adopts the standard of causation as set forth in United States v. Hibbs, 568 F.2d 347 (3d Cir. 1977), pertinent and controlling in this matter.  Before Chabot can recover damages, Chabot must demonstrate the element of causation between the false statements and the loss.  Chabot has not demonstrated or pleaded facts sufficient to prove actual loss to the government caused by D&G's false claims.

Accordingly, the Court DECLINES to award damages on default, as they have been inadequately set forth in a well-pleaded complaint.  Nishimatsu Constr. Co., 515 F.2d at 1206.

## IV.  Conclusion

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

---

[2] Chabot arrives at this dollar value by subtracting the amount that D&G billed the government from treble the billed amount (2,944,474.50 – 981,491.50 = 1,962,983). Chabot relies on U.S. v. Entin, 750 F. Supp. 512 (S.D. Fla. 1990) (citing U.S. v. Bornstein, 423 U.S. 303 (1976)), to support this formula, but in Entin, the court determined the actual loss that the government sustained.

(1) Plaintiff Chabot's Motion for Entry of Default Judgment as to liability is **GRANTED**.

(2) Plaintiff Chabot's Motion for Entry of Default Judgment as to statutory penalties is **GRANTED in part** and **DENIED in part**.  A penalty of **$90,000** shall be assessed against D&G.

(3) Plaintiff Chabot's Motion for Entry of Default Judgment as to damages is **DENIED.**

**DONE** and **ORDERED** in Orlando, Florida, this 29th day of March 2010.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record
Any Unrepresented Party